**UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 157, on behalf of its Members, Plaintiff,**

v.

**OEM/ERIE WESTLAND, LLC, OEM/ Erie Inc., Libralter Plastics, Inc., and Donald Cunningham, Defendants.**

No. 00–75555, 01–70139.

United States District Court, E.D. Michigan, Southern Division.

May 8, 2002.

Bruce A. Miller, Eric I. Frankie, Miller Cohen, Richard G. Mack, Detroit, MI, for Plaintiffs.

Wallace M. Handler, Sullivan, Ward, Southfield, MI, Michael C. Hammer, Rick A. Haberman, Dickinson, Wright, Detroit, MI, for Defendants.

## OPINION AND ORDER REGARDING DEFENDANT LIBRALTER PLASTICS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW") Local 157 instituted the first of these two consolidated actions in this Court on December 27, 2000, and the

second action on January 11, 2001,[1] asserting claims of breach of a collective bargaining agreement ("CBA") and violations of the federal Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.*, arising from the January 2001 closing of a plant in Westland, Michigan operated by Defendant OEM/Erie Westland, LLC ("OEM LLC"), a parts manufacturer for the automobile industry. The three other Defendants in these actions—OEM/Erie, Inc. ("OEM/Erie"), Libralter Plastics, Inc. ("Libralter"), and Donald Cunningham—are the constituent members of Defendant OEM LLC. This Court has subject matter jurisdiction over these matters under 28 U.S.C. § 1331.

Shortly after the commencement of these actions, Defendant Libralter filed a motion to dismiss, arguing that its limited interest and role in the entity which operated the Westland facility, OEM LLC, was insufficient as a matter of law to charge Libralter with liability as either an "employer" under the WARN Act or a signatory under the CBA between the Plaintiff union and OEM LLC. By Opinion and Order dated September 27, 2001, the Court denied this motion, concluding that the allegations of Plaintiff's complaints were sufficient to warrant further discovery as to the degree of Libralter's involvement in OEM LLC's management and daily operations. Accordingly, the Court found that it would be "premature to preclude Plaintiff from going forward with its breach of CBA and WARN Act claims against Defendant Libralter." (9/27/01 Op. at 15.)

The discovery period has now closed,[2] and Libralter has renewed its argument in a motion filed on October 31, 2001, this time seeking summary judgment in its favor on a more complete evidentiary record. Plaintiff responded to this motion on November 26, 2001, identifying various respects in which, in its view, Libralter played a significant role in both the ongoing operations of the Westland facility and the decision to close the plant. On December 13, 2001, Libralter filed a reply brief in further support of its motion.[3]

The Court met with counsel regarding Libralter's motion on April 11, 2002. Having reviewed the parties' submissions and the record as a whole, and having considered the arguments of counsel at the April 11 conference, the Court now is prepared to rule on Libralter's motion. This Opinion and Order sets forth the Court's rulings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties to These Actions

Plaintiff UAW Local 157 represents the union workers who were employed at a plastic injection molding plant in Westland, Michigan at the time of its closing in January of 2001. This Westland facility was operated by Defendant OEM/Erie Westland, LLC. The remaining three Defendants in these actions—OEM/Erie, Inc., Libralter Plastics, Inc., and Donald Cunningham—are the three constituent members of Defendant OEM LLC, with Defendant OEM/Erie holding a 50–percent

---

1. These two cases were consolidated into Case No. 00–75555 by order dated April 2, 2001.

2. Naturally, however, given the parties' contentious behavior throughout this litigation, the discovery period has left a residue of disputes and motions that remain pending.

3. The remaining Defendants filed a separate motion for summary judgment on October 31, 2001. The Court has been advised, however, that these Defendants have reached a settlement with Plaintiff. Accordingly, the Court need not rule on this motion.

interest, Defendant Cunningham possessing a 26–percent interest, and Defendant Libralter holding the remaining 24–percent share. Defendant Cunningham is the president and treasurer of OEM LLC, as well as the president and majority owner of OEM/Erie.

## B. The Formation of OEM LLC

OEM LLC was formed in connection with Libralter's sale of the Westland facility in September of 1999. Prior to that time, Libralter maintained plastic injection molding plants in Westland and Walled Lake, Michigan. After the sale, Libralter continued to operate its Walled Lake facility, with OEM LLC assuming the operations at the Westland facility. However, Libralter retained an interest in this latter enterprise, through its membership in the LLC. One of the principal issues in this case is the degree to which Libralter maintained and exercised control over the operations at the Westland facility during the roughly 15–month period between Libralter's sale of the business and the plant's closing in January of 2001.

All are agreed as to OEM/Erie's motive in acquiring an interest in the Westland facility. In particular, while OEM/Erie's principal place of business is in Pennsylvania, it apparently was urged by some of its key customers, including General Motors, to transfer some of its jobs to Michigan. OEM/Erie viewed the purchase of the Westland plant as a means of satisfying these client demands.

The parties are in sharp disagreement, however, as to Libralter's motive in selling the Westland facility. In late 1998, the workers at Libralter's plant elected Plaintiff as their union representative. Plaintiff has produced affidavits from workers recounting alleged statements by Terry Barr, Sr., Libralter's majority owner and then-president, and Alan Barr, Libralter's current president, that they would shut down the plant if the workers voted for union representation.[4] Plaintiff charges that this is precisely what happened, where the company soon began to report losses, and where the decision to sell the plant was made during the time of the union organizing campaign. Libralter, for its part, cites financial distress and an "internal restructuring plan" as its grounds for seeking a purchaser for the Westland facility.

Whatever the parties' objectives, the record is clear that the September 1999 transfer of operations at the Westland plant was not accomplished through an outright sale of the business, but instead entailed a more complex arrangement. First, as noted, Libralter retained a 24–percent ownership interest in the purchasing entity, OEM LLC. Under the OEM LLC "Operating Agreement," Libralter was granted the power to appoint the LLC's vice-president, but it does not appear that this authority was ever exercised. The Operating Agreement also called for Libralter to make an initial capital contribution of $360,000.[5]

Next, the parties executed an "Asset Purchase Agreement," under which OEM LLC purchased substantially all of the assets at the Westland facility—including the machinery, equipment, tools, and inventory—and assumed Libralter's interest in most of the contracts being performed at the plant. OEM LLC agreed to pay just over $3 million for the machinery and equipment in accordance with the terms of a promissory note, with Libralter granted

---

4. Although Libralter dismisses these statements as "hearsay," the Federal Rules of Evidence indicate otherwise. *See* Fed.R.Evid. 801(d)(2)(D).

5. Libralter did not make a direct cash contribution. Instead, this amount was netted against the plant's inventory at the time of the sale.

a security interest in this equipment. Under this agreement, Libralter retained its ownership of the land and building, and OEM LLC became its tenant.[6]

This agreement also addressed the recent election of Plaintiff as the bargaining representative for the employees at the Westland facility:

> *Union Matters.* It is contemplated by this Agreement, that both Buyer [OEM LLC] and Seller [Libralter] will recognize the UAW as the representative of the Employees and each of the Buyer and Seller will satisfy their respective bargaining obligations under the National Labor Relations Act. Further, Buyer recognizes its obligations to the UAW with respect to the Business and the Employees pursuant to the certification of the UAW by the National Labor Relations Board dated May 18, 1999. Buyer covenants and agrees with Seller to bargain in good faith with the UAW in accordance with such certification and its obligations as an employer under the National Labor Relations Act.

(Libralter's Motion, Ex. 8, Asset Purchase Agreement at 23.) OEM LLC further agreed to accept responsibility "for any liability and notification under the [WARN] Act relating to the termination of any Employees." (*Id.*) In addition, the agreement called for Libralter to pay the cost of medical benefits for the plant's employees for a period of up to 60 days, subject to reimbursement by OEM LLC.[7]

Finally, OEM LLC and Libralter entered into a "Services Agreement," which called for Libralter to continue providing a number of services at the plant, including program management, production quality, engineering, accounting, and information systems. Libralter agreed to provide these services for a period of five years, unless one of the parties terminated the agreement in accordance with its terms. Libralter, for example, was entitled to terminate the agreement upon ten days' written notice if OEM LLC failed to make the required payments, totaling $74,200 per month.

## C. The Operation and Closing of the Westland Plant

By all accounts, OEM LLC was unsuccessful in operating the Westland facility. For example, at some point before the summer of 2000, General Motors refused to grant OEM LLC's request for price increases on two of the plant's largest contracts, in order to offset the losses sustained in servicing these contracts. Following this refusal, the LLC asked GM to take back these contracts, so that it could identify new business opportunities that might produce profits. GM agreed, but OEM LLC was unable to locate sufficient business to make up for the plant's losses.

During this same period, a number of disputes arose between OEM LLC and Libralter, primarily involving the parties' respective obligations under the Services Agreement. OEM LLC was past due with some of its payments under this agreement, and also complained to Libralter on several occasions that the monthly fees charged under this agreement were excessive. Indeed, one of OEM/Erie's owners, John O'Neill, testified that the LLC was "being raped" through the arrangement called for in the Services Agreement. (O'Neill Dep. at 123.) Libralter, for its part, responded by shutting down the LLC's computer system on more than one occasion, resulting in significant disrup-

---

6. The lease called for the LLC to purchase the building within a year. It does not appear that this property transfer took place, however.

7. The record indicates that, apart from providing these medical benefits, Libralter also covered the payroll obligations of the LLC for several weeks after the sale of the business.

tions to the operations at the Westland facility. The plant's general manager, Martin O'Brien, characterized his discussions with Libralter on this issue as pleas "not [to] kill the plant operation." (O'Brien Dep. at 59.)

In the late summer and fall of 2000, OEM LLC's principal lender, Comerica Bank, notified the company that no further credit would be forthcoming, unless the LLC's members would agree to put more money into the company or new business could be found. These financial difficulties culminated in a decision in December of 2000 to close the plant. Libralter claims that it did not participate in this decision, citing its lack of attendance at the December meeting at which Cunningham and others ultimately determined that the facility should be closed. Plaintiff, however, cites John O'Neill's testimony as to a meeting he attended in late 2000 along with Cunningham and representatives of Libralter, at which Libralter refused Cunningham's request for a further capital contribution. Cunningham reportedly stated that, under these circumstances, he would have to "entertain closing the facility down," and the Libralter representatives reportedly responded "go do it," and that "[t]hey didn't care." (O'Neill Dep. at 116–17, 120.) Similarly, Cunningham has testified that Libralter's refusal to make a further contribution was a factor in the decision to close the plant. (Cunningham Dep. at 193.) Finally, as a practical matter, Libralter effectively shut down the facility's operations when it "pulled the plug" on the plant's computer systems in January of 2001. (*See* Fredericks Dep. at 274–78.)

By letter dated December 18, 2000, Cunningham notified the Plaintiff union that the Westland facility would be permanent-ly closed on December 30, 2000. Limited operations continued beyond this date, however, as the LLC, with the assistance of General Motors and a "work out" firm, BBK, sought to complete some of its GM work. The plant apparently closed its doors on January 21, 2001.

## D. Procedural Background

Plaintiff brought the first of these two consolidated actions on December 27, 2000, charging that OEM LLC and its three constituent members failed to give 60 days' notice of the closing of the Westland facility, in violation of the federal WARN Act, 29 U.S.C. § 2101 *et seq.* Instead, Plaintiff alleges that it was provided only a few days' notice, learning of the impending December 30, 2000 plant closing on December 21.

Plaintiff then brought a second action and a motion for preliminary injunction on January 11, 2001, in an effort to preserve the status quo while it pursues grievances on behalf of its membership. These grievances charge that, in connection with the impending closing of the Westland plant, OEM LLC refused to pay vacation pay, insurance "opt out" payments, attendance bonuses, and severance pay as mandated under the parties' collective bargaining agreement ("CBA"), and that the LLC diverted work to plants operated by its constituent members without giving workers the opportunity to transfer to those facilities. These grievances were submitted to arbitration in accordance with the terms of the CBA, and arbitration proceedings apparently commenced in the fall of 2001.[8] Plaintiff alleged that, absent injunctive relief preserving the assets of OEM LLC, its constituent members would liquidate all of the company's assets, and

---

**8.** The parties indicated at the April 11 conference that the arbitrator recently issued a deci-sion, but this ruling is not in the record.

thereby render meaningless any arbitration award Plaintiff might receive as a result of its grievances. On January 16, 2001, the Court heard argument on Plaintiff's motion for preliminary injunction and granted this motion in part, with a preliminary injunction entered on March 8, 2001.[9]

As noted above, Defendant Libralter sought dismissal in the early stages of this litigation, arguing that Plaintiff had not identified any basis for charging Libralter with liability for any alleged violations of the CBA or the WARN Act by Defendant OEM LLC. The Court denied this motion in an Opinion and Order dated September 27, 2001, finding that further discovery was warranted to afford Plaintiff the opportunity to ascertain the nature and degree of Libralter's involvement in OEM LLC's management and daily operations. The discovery period has now closed, and Libralter has renewed its argument that Plaintiff has failed to establish a basis for holding Libralter separately liable under either a breach-of-CBA or a WARN Act theory of recovery. This motion has been fully briefed on both sides, and the Court addressed this matter with counsel at a conference held on April 11, 2002.

## III. *ANALYSIS*

### A. The Standards Governing Libralter's Motions

In its present motion, Libralter seeks the entry of summary judgment in its favor on Plaintiff's breach-of-CBA and WARN Act claims. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[10] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having

---

9. This preliminary injunction was amended on April 27, 2001, and again on December 19, 2001, both by stipulation of the parties.

10. "[T]aken together, these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure*, § 2727, at 468 (1998) (footnote omitted).

had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in considering Libralter's motion.

## B. Plaintiff Has Identified Issues of Fact as to Libralter's Separate Liability for Alleged Violations of the WARN Act and the Collective Bargaining Agreement.

As observed in the Court's prior Opinion and Order, the federal WARN Act imposes obligations only upon "employers," *see* 29 U.S.C. § 2102(a), and the terms of a CBA generally may be enforced only against its signatories. In support of its present motion, Libralter argues that neither of these conditions precedent to its liability is satisfied here, where it was not a signatory to the CBA governing the employees at the Westland facility, and

where, by all outward appearances, these workers were employed by OEM LLC, and not Libralter. Libralter further asserts that the broader scope of liability embodied in the "single employer" and "alter ego" theories is inapplicable here, where, in its view, it maintained an arm's-length relationship with OEM LLC, and did not exercise operational control over the Westland plant. Libralter contends, in essence, that its degree of involvement with the LLC was entirely consistent with its role as a secured creditor, and with the terms of the parties' various arm's-length agreements, including the Operating Agreement, the Asset Purchase Agreement, and the Services Agreement. The Court finds, however, that Plaintiff's evidence to the contrary raises genuine issues of fact as to whether Libralter exercised the requisite degree of control over the plant's operations.

Turning first to Plaintiff's claim of a WARN Act violation, this federal statute defines an "employer" as "any business enterprise that employs ... 100 or more employees." 29 U.S.C. § 2101(a)(1). The courts have recognized that this definition does not turn on the formalities of corporate organization, but instead reaches "*any* defendant who engages in a 'business enterprise.'" *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir.1995). "[T]he crucial question is not the status of the defendant's legal relationship to the business, but, instead, if at the time of the plant closing or mass layoff the defendant is responsible for operating the business as a going concern." *Weslock Corp.*, 66 F.3d at 244; *see also Adams v. Erwin Weller Co.*, 87 F.3d 269, 271–72 (8th Cir.1996).

A Department of Labor ("DOL") regulation lists five factors to be considered in determining whether a partially or

wholly owned subsidiary should be treated as a distinct "employer" under the WARN Act, or instead as a "single employer" along with its parent. These factors include: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2); *see also Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993–94 (6th Cir.1997) (citing a similar set of factors for determining whether two companies may be treated as a "single employer" in an employment discrimination suit). This list is not intended to be exhaustive, however:

> [I]n determining whether two or more corporations constitute a single "employer," the factfinder may consider not only the aspects of corporate organization specifically listed in the regulation, but also may consider the other indicia of corporate "sameness" that have characterized this area of the law, such as nonfunctioning of officers and directors, gross undercapitalization, and other circumstances that demonstrate a lack of an arm's-length relationship between the companies.

*Pearson v. Component Technology Corp.*, 247 F.3d 471, 491 (3d Cir.), *cert. denied*, — U.S. —, 122 S.Ct. 345, 151 L.Ed.2d 261 (2001).

Although the DOL regulation purports to address only the relationship between a parent and subsidiary, the courts have found its factors to be informative outside of this specific context. *See, e.g., Pearson*, 247 F.3d at 482–96; *Reyes v. Greater Texas Finishing Corp.*, 19 F.Supp.2d 709, 712–13 (W.D.Tex.1998). Thus, in its earlier Opinion and Order, this Court looked to the regulation and related principles for guidance in determining whether Libralter and OEM LLC could be viewed as a "single employer" under the WARN Act. *Cf. Pearson*, 247 F.3d at 482–91 (surveying the various tests applied by the courts, including corporate law veil-piercing theories and the "integrated enterprise" theory arising under federal labor law, and concluding that the DOL factors were intended to harmonize these theories into a single test of affiliated corporate liability under the WARN Act). The parties, likewise, have constructed their present arguments around the five DOL factors and related considerations. Accordingly, the Court turns to the record, with a view toward determining whether Plaintiff's evidence would permit the conclusion that Libralter and the LLC are a "single employer."

■ The first DOL factor, common ownership, appears to be present here, in light of Libralter's 24–percent interest in OEM LLC. Libralter contends, however, that it held only a "minority" interest, and that this interest was "heavily qualified," where (i) Libralter had the right to redeem its share of the company after two years, and (ii) the LLC's Operating Agreement granted certain aspects of management authority to the "Majority in Interest," meaning Cunningham and OEM/Erie. The first of these purported "qualifications" lacks legal significance, however, as Libralter did not, in fact, divest itself of its ownership interest in the LLC. As to the second point, the Court notes that Libralter did retain one important management power—namely, to control whether the LLC would dissolve and wind up its affairs, a event that could occur only upon "the unanimous decision of all of the Members." (Libralter's Motion, Ex. 5, Operating Agreement at 13.) This reservation of authority is particularly important here, where Plaintiff's WARN Act claim arises from the decision to close the Westland facility.

The next factor, common directors and officers, is considerably less decisive in this

case. Plaintiff has been unable to point to any individual who was designated as a director or officer of both Libralter and OEM LLC. Nevertheless, the union contends that the executive vice president of Libralter, Terry Kazakos, served in a "de facto" management role for the LLC by assisting in the solicitation of new business for the Westland facility. In support of this proposition, Plaintiff points to the testimony of John O'Neill, one of the owners of OEM/Erie, that Kazakos participated in at least one meeting addressing the issue of generating new sales for the LLC, and that he otherwise had some involvement in the LLC's attempts to bring in new customers. Similarly, the general manager of the Westland plant, Martin O'Brien, testified that Kazakos occasionally notified him that a potential customer would be visiting the facility, and that "I received several phone calls ... over the period of time after the joint venture from [Kazakos] ... in regards to customers." (O'Brien Dep. at 64–67.)[11] Plaintiff maintains that this evidence raises an issue of fact as to whether Kazakos had a "dual agency" role, acting on behalf of both Libralter and the LLC.

As Libralter points out, however, Kazakos's limited role in the solicitation of customers and sales falls far short of the operational authority that the courts typically look for in support of a claim of common management. In *Weslock Corp.*, for example, the Ninth Circuit found insufficient evidence that an individual alleged by the plaintiff union to be a de facto plant manager had served in this capacity, where he "apparently did not participate in decisions concerning the plant's production output, the marketing of the plant's product, or the plant's employment practices," so that he could not be said to be "in-

volve[d] in the functional operations" of the plant. *Weslock Corp.*, 66 F.3d at 245. Although this individual did "maintain[ ] an on-going involvement in [the plant's] financial problems," the Court found that this was "consistent with the type of control a secured creditor legitimately may exercise over a defaulting debtor to protect collateral securing a loan." 66 F.3d at 245. Likewise, in this case, where Libralter was a secured creditor of OEM LLC, Kazakos's limited assistance in the procurement of new business for the Westland plant is wholly consistent with Libralter's presumed desire to shore up the financial status of a troubled debtor, and falls well short of involvement in the functional operations of the facility. This factor, then, tends to favor Libralter.

The next DOL factor, however, de facto exercise of control, tends to favor Plaintiff's position. Here, of course, where the claim at issue is an alleged WARN Act violation in the closing of the Westland facility, the most important consideration is whether this plant closing was a result of such a de facto exercise of control by Libralter. As noted, Libralter denies any role in the decision to close the plant. Yet, Plaintiff has produced at least some evidence to the contrary, including (i) the alleged statement by Libralter representatives, in response to Cunningham's warning that he might be forced to shut down the plant, that he should "go do it," and that "[t]hey didn't care"; (ii) Cunningham's testimony that Libralter's unwillingness to make an additional capital contribution was a factor in the decision to close the plant; and (iii) testimony that Libralter effectively terminated the plant's operations in January of 2001 when, despite the request of a key customer, General Mo-

---

**11.** Plaintiff also notes that O'Brien initially was hired as a Libralter employee in May of 1999, and was reassigned to the LLC at the time this "joint venture" was established in September of 1999. (*See* O'Brien Dep. at 9, 45–47.)

tors, Libralter "pulled the plug" on the facility's computer systems.

Libralter responds that all of these actions were consistent with its purportedly arm's-length relationship with the LLC, as embodied in the operating, asset purchase, and services agreements. This appeal to these arm's-length agreements loses some of its force, however, when it is recalled that the formal plant closing decision apparently was not made in accordance with the Operating Agreement, which seemingly required a unanimous decision by all of the LLC's members, including Libralter. Libralter further points out that its position as a potential "financial life-line" for the LLC "does not translate into decision-making control for the purposes of WARN's employer rule," but instead merely gave it a power that is "inherent in any debtor-creditor relationship." *Adams*, 87 F.3d at 272. Yet, the Court views the record as permitting the conclusion that Libralter went beyond a mere passive refusal to infuse more capital into the LLC, and that its actions, particularly as a provider of core plant services, played a more direct and affirmative role in the closing of the Westland facility.

In addition, Plaintiff has identified other respects in which Libralter exercised de facto control, arguably beyond what would be expected in a pure arm's-length relationship. First, under the terms of the Operating Agreement and the lease governing OEM LLC's use of Libralter's property, the LLC was restricted to the business of manufacturing plastic components and systems for the automotive industry. Next, under the Services Agreement, Libralter (i) retained the sole authority to "determine the mechanics of performing the Services required hereunder," (Libralter's Motion, Ex. 10, Services Agreement at 1); (ii) dictated the type of accounting system to be used at the Westland plant, with its modules "configured by and for" Libralter, and with only "[m]inor alterations" permitted "within reason," (Libralter's Motion, Ex. 11, Schedule 1 to Services Agreement at 14); and (iii) likewise, with the computer system, dictated the hardware and software to be used, with Libralter's approval required for "[a]ny necessary hardware/software additions or changes," (*id.* at 7).

More significantly, the Asset Purchase Agreement called for the execution of a "Sales Representative Agreement" with Terry Barr Sales, an agency owned by the owners of Libralter and run by one of these owners, Terry Barr, Jr. Under this sales representative agreement, Terry Barr Sales apparently was designated the exclusive representative for solicitation of orders of the LLC's products from certain specified customers. John O'Neill testified that this sales agency occasionally would contact him to demand the payment of commissions, but that he had a difficult time determining what services the agency had performed on behalf of the LLC or how much it was owed, because Libralter "controlled the transactions," "issued the invoices," and "had the paperwork" with regard to this matter. (O'Neill Dep. at 165–67.) This evidence, in particular, suggests a degree of control over and above what would be expected in a typical arm's-length relationship, where one business generally would not insist upon the other's choice of a particular sales representative.

The fourth DOL factor, unified personnel policies emanating from a common source, once again tips the balance somewhat back toward Libralter's position. To be sure, Plaintiff has produced evidence of some commonality in employment relations practices, where (i) the LLC took on many of Libralter's Westland employees at the same salaries, seniority, and other benefits; (ii) Libralter covered the wages and

benefits of OEM LLC's employees during a brief initial period after the formation of the LLC; (iii) Libralter handled OEM LLC's human resources functions for a few months in 1999, while the LLC replaced an employee who had performed these duties; and (iv) OEM LLC's human resources director occasionally contacted her counterpart at Libralter for guidance in resolving payroll issues and matters of policy interpretation. Yet, none of this evidence is particularly suggestive of Libralter's retained control over the Westland operation; rather, many of these same events might well have occurred even if Libralter had sold the business outright to OEM LLC, without retaining any ownership interest. Nor does the Court find much significance in Plaintiff's evidence suggesting that concerns expressed by Martin O'Brien at OEM LLC might have contributed to the termination of a Libralter employee, Rebecca Bowes. Again, such feedback is not especially indicative of overlapping management, but rather is wholly consistent with Libralter's acknowledged role as service provider for the Westland facility.

It is this role, however, that features prominently in the Court's consideration of the final DOL factor, dependency of operations. This aspect of the relationship between OEM LLC and Libralter represents the most significant departure from a traditional buyer/seller or creditor/debtor arrangement. Under the Services Agreement, Libralter continued its involvement in several important areas of the Westland operation, including program management, production quality, engineering, accounting, and information systems. In contrast to the situation regarding employee wages and benefits, Libralter's role in providing these other services was not transitional, but was to continue for a period of five

years. Moreover, Terry Kazakos of Libralter acknowledged that these services were "essential" to the operation of the Westland facility. (Kazakos Dep. at 207, 209.) Indeed, because of their importance, Libralter used these services as leverage, occasionally discontinuing them as a means of compelling OEM LLC to make its payments under the Services Agreement. (*See id.* at 208.) As noted earlier, this continued up until the closing of the plant, an event arguably precipitated in part by Libralter's shutdown of the facility's computer systems.

To the extent that Libralter argues that this interdependency is merely a reflection of the parties' arm's-length vendor/supplier relationship as established through the terms of the Services Agreement, Plaintiff points to the various ways in which Libralter's conduct deviated from that which might be expected from a typical vendor under similar circumstances. First, when OEM LLC failed on several occasions to timely pay the fees called for under the Services Agreement, Libralter generally responded with verbal communications and temporary interruptions of service, rather than providing the written notice of default called for in the Services Agreement itself or seeking to invoke its express provision for termination.[12] More generally, Libralter has not identified a paper trail, whether invoices or other written communications, through which it informed the LLC of the extent of the arrearage under this agreement. Similarly, while the Services Agreement set forth anticipated numbers of hours per week that would be required for program management and engineering services, it appears that neither Libralter nor OEM LLC kept track of the number of hours actually spent on these services, so that neither party could be assured that

---

**12.** Only one such written notice appears in the record, dated November 28, 2000 and

stating that the November 1 payment had not been made.

the payments called for in the Services Agreement were reasonable and appropriate. This seeming indifference is somewhat at odds with a traditional arm's-length relationship.

In sum, the Court finds that several of the indicia of "single employer" status, as reflected in the DOL factors, enjoy some degree of support in the evidentiary record. Moreover, at least one other factor cited in *Pearson, supra,* 247 F.3d at 491, the "nonfunctioning of officers and directors," also enters into consideration here, where Libralter concedes that it did not exercise its power under the Operating Agreement to appoint a vice-president for OEM LLC. All of these indicia, in the Court's view, are sufficient to raise a genuine issue as to the applicability of the "single employer" doctrine to Libralter. Under these circumstances, the trier of fact must weigh all of the evidence to determine whether Libralter is subject to WARN Act liability as an "employer" at the Westland facility.

It follows, for the same reasons, that the Court cannot foreclose as a matter of law the possibility that Libralter might be liable under Plaintiff's breach-of-CBA claim.[13] As explained in the Court's prior Opinion and Order, the considerations governing this inquiry are nearly identical to those involved in the "single employer" test for WARN Act liability. (*See* 9/27/01 Op. and Order at 13–14.) Accordingly, the Court finds that Libralter is not entitled to

summary judgment in its favor on this issue.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Libralter Plastics' October 31, 2001 Motion for Summary Judgment is DENIED.

---

**13.** The Court notes that it presently is not called upon to consider the merits of this claim, because the parties' CBA-based disputes have been submitted to arbitration. In this regard, Plaintiff's breach-of-CBA claim essentially serves as a "placeholder," providing an arguable jurisdictional basis for the Court to issue the preliminary injunctive relief sought by Plaintiff in order to preserve the status quo during arbitration. Accordingly, any question as to which parties might ultimately be subject to liability for any alleged

breaches of the CBA lies far outside the principal focus of this case, and seemingly would become relevant only if (i) Plaintiff prevails in arbitration and obtains an award; (ii) the union seeks judicial enforcement of this award; and (iii) Plaintiff, for whatever reason, seeks to collect from parties other than the CBA signatory, OEM LLC. Under these circumstances, the Court is reluctant to devote a great deal of its resources to this issue, and reserves the right to revisit the matter if and when it gains additional relevance.